AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| BLACK ALCATEL FLIP PHONE, MODEL:  A405DL, FCC ID: 2ACCJN023, IMEI:  015551004180225, CURRENTLY LOCATED AT 601 4TH STREET NW, WASHINGTON, D.C.  20535, UNDER RULE 41 | ) ) ) ) ) |

Case No.  21-SW- 37

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

Located in the _____ District of Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 111(a)(1) - Assault on Federal Officer; 18 U.S.C. § 231(a)(3) - Obstruction of Law Enforcement During Civil Disorder; 40 U.S.C. § 5104(e)(2) - Violent Entry and Disorderly Conduct on Capitol Grounds. | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Jonathan Fugitt, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date: ___2/2/2021___

_____
*Judge's signature*

City and state: ___Washington, D.C.___

ROBIN M. MERIWEATHER
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☑ Original            ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>BLACK ALCATEL FLIP PHONE, MODEL:  A405DL, FCC ID:<br>2ACCJN023, IMEI:  015551004180225, CURRENTLY LOCATED<br>AT 601 4TH STREET NW, WASHINGTON, D.C.  20535, UNDER<br>RULE 41 | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No.   21-SW- 37 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of Columbia _____ .
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before      February 15, 2021      *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ ROBIN M. MERIWEATHER _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      2/2/2021 _____        _____
*Judge's signature*

City and state:      Washington, D.C. _____        ROBIN M. MERIWEATHER
United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    21-SW- 37 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## __ATTACHMENT A__

*Property to be searched*

The property to be searched is:

> Black Alcatel flip phone, Model: A405DL, FCC ID:  2ACCJN023, IMEI: 015551004180225, telephone number (301) 525-7180 ("Device-2"),

which is currently located at 601 4th Street NW, Washington, D.C.  20535.

## ATTACHMENT B

*Property to be seized*

1.       The information and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. §§ 231(a)(3), 111(a)(1), 1752(a)(4) and 40 U.S.C. § 5104(e)(2)(F) (the "Target Offenses"), as described in the search warrant affidavit, including, but not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data that relates to:

   a.   Records and information relating to travel to the Washington D.C. area on or about January 6, 2021, including but not limited to evidence of gasoline and restaurant receipts;

   b.   Records and information relating to unlawfully entering the U.S. Capitol, including any photographs and videos of the property of the U.S. Capitol Building or Grounds, and any maps or diagrams of the same;

   c.   Records and information relating to awareness of the official proceeding that was to take place at Congress on January 6, 2021, *i.e.,* the certification process of the 2020 Presidential Election;

   d.   Records and information relating to efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, *i.e.,* the certification process of the 2020 Presidential Election;

   e.   Records and information relating to a conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

   f.   Records and information relating to the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

   g.   Records and information relating to the riot and/or civil disorder at the United States Capitol on January 6, 2021;

1

h.   Records and information relating to the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

i.   Records and information relating to any conspiracy, planning, or preparation to commit the Target Offenses;

j.   Records and information relating to BLAIR's state of mind with respect to members of the United States Congress and Senate, law enforcement in Washington, D.C., and/or United States Government officials;

k.   Records and information relating to the layout of the U.S. Capitol and other United States Government buildings in Washington, D.C.;

l.   Records and information relating to BLAIR's state of mind with respect to the U.S. Congress, the 2020 presidential election, the January 6, 2021 certification of the 2020 presidential election, and the January 20, 2021 presidential Inauguration;

m.   Other evidence of the state of mind of BLAIR and/or co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the Target Offenses; and

n.   Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the Target Offenses, including records and information that help reveal their whereabouts.

o.   Records and information relating to interest or participation in, or associations with other individuals, to include communications between BLAIR and other individuals who may have assisted or provided support which would constitute evidence of the Target Offenses;

p.   Communications relating to conspiracy, interest, planning or preparation to commit the target offenses, to include communications between BLAIR and other individuals who may have collaborated, conspired assisted (knowingly or unknowingly) or otherwise provided support to BLAIR and/or his co-actors in committing the target offenses, or communicated with BLAIR about matter relating to the Target Offenses;

q.  Photographs or videos documenting BLAIR's presence in Washington, D.C., on January 6, 2021, or that contains photographs or videos documenting the actions and presence of others at or near the U.S. Capitol on January 6, 2021;

r.  Photographs or videos documenting a black jacket, grey sweatshirt, white long sleeved shirt, khaki pants, grey and black sneakers, tan and black gloves, black belt or a black in color bag with "TEMPO" in yellow block lettering and light in color drawstrings;

s.  Photographs or videos documenting confederate flags and lacrosse sticks;

t.  Evidence of who used, owned, or controlled Device-2 at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

u.  Evidence of software, or the lack thereof, that would allow others to control Device-2, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

v.  Evidence of the attachment to Device-2 of other storage devices for electronic data;

w.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from Device-2;

x.  Evidence of the times Device-2 was used in connection with the Target Offenses;

y.  Passwords, encryption keys, and other access devices that may be necessary to access Device-2;

z.  Documentation and manuals that may be necessary to access Device-2 or to conduct a forensic examination of Device-2;

aa. Records of or information about Internet Protocol addresses used by Device-2 in connection with the Target Offenses; and

bb. Records of or information about Device-2's Internet activity, in connection with the Target Offenses, including firewall logs, caches, browser history and cookies,

3

"bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF BLACK ALCATEL FLIP PHONE, MODEL:  A405DL, FCC ID: 2ACCJN023, IMEI:  015551004180225, CURRENTLY LOCATED AT 601 4TH STREET NW, WASHINGTON, D.C.  20535, UNDER RULE 41** | **No. 21-SW-37** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Jonathan B. Fugitt, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of Device-2, which is currently in law enforcement possession as described in Attachment A, and the extraction from that property of electronically stored information, as described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation.  I have been in this position since January of 2017.  I am currently assigned to the Washington, D.C. Cross Border Task Force, which is a squad that investigates violent gangs and drug trafficking and is located at the Washington, D.C. Field Office ("WFO") of the FBI.  I have been assigned to this squad since June, 2017.  As part of my duties as an FBI Special Agent, I investigate criminal violations relating to narcotics trafficking, firearms trafficking, violent incidents, and gang related matters.  These violations can include the use of violence, committing violence, or attempting to commit violence in support of narcotics trafficking, firearms trafficking, and/or gang related matters. In addition,

1

these violations can include conspiracy to traffic narcotics and/or firearms.  Based on your affiant's training and experience, your affiant knows that individuals involved in criminal activity often communicate about their criminal activity over cellular telephones, including via text messages, telephone calls, telephone applications ("apps"), and through various social media accounts.  A variety of data is thus captured by the cellular telephone being used to send and receive such electronic data, including communication logs, packet data, location data associated with the account, and the content of certain communications.  Thus, cellular telephones often retain electronic information that will assist law enforcement in identifying individuals involved in criminal activity, their respective involvement in criminal activity, and where they were located at specific times.  As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 231(a)(3), 111(a)(1), 1752(a)(4) and 40 U.S.C. § 5104(e)(2)(F) (the "Target Offenses"), have been committed by DAVID BLAIR ("BLAIR").  There is also probable cause to search Device-2, further described below and in Attachment A, for the things described in Attachment B.

5.     The property to be searched is a Black Alcatel flip phone, Model:  A405DL, FCC ID:  2ACCJN023, IMEI:  015551004180225, telephone number (301) 525-7180 ("Device-2"). Device-2 is currently located at 601 4th Street NW, Washington, D.C.  20535.  Device-2 was seized during an execution of a search warrant at BLAIR's residence on or about January 22, 2021 (as detailed below).

## PROBABLE CAUSE

### Background – The U.S. Capitol on January 6, 2021

6.     USCP, the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C.  20510, at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.     At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

8.     The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

10.      On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.   During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").   The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).   Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.   Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

11.      As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.   As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

12.      At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

13.      At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.   Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

4

14.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

15.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

16.     Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



17.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

18.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the

federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained.  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

19.   Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

20.   At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

21.   At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



22.    After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



23.     An unknown subject left a note on the podium on the floor of the Senate Chamber.

This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



24.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the US Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





25.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

26.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

27.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

28.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

29.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons

11

check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

30.    Beginning around 8:00 p.m., the Senate resumed work on the Certification.

31.    Beginning around 9:00 p.m., the House resumed work on the Certification.

32.    Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

33.    During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

34.    Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

35.    Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of

themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

36.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:



---

[1]https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/





2https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.

3https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

**Facts Specific to This Application**

38.     On January 6, 2021, during the above-referenced events, Officer K.P. ("K.P.") of the Washington D.C. Metropolitan Police Department ("MPD") was working his[4] evening shift in his official capacity.  During that shift, MPD Officer K.P. was directed to report to the U.S. Capitol building to assist the U.S. Capitol Police in their duties to maintain security of the U.S. Capitol building.

39.     Between 5:00 pm and 6: 00 pm, K.P., along with MPD CDU (Civil Disobedience Unit) 63, formed a line at the west terrace of the U.S. Capitol building and began moving towards the west lawn to move individuals off Capitol grounds.  CDU 63 chanted "move back" as it ordered the crowd of individuals on the west lawn to move west and away from the U.S. Capitol building.  See the map below:

---

[4]Unless otherwise stated, for the safety of victims and witnesses, victims and confidential sources of information are referred to using male pronouns (regardless of gender) and conversations about victims and confidential sources of information have been altered as necessary to reflect male pronouns.



40.     CDU 63 advanced on the crowd as a line and managed to create space between the officers and the crowd.  At 5:47 pm, while still on the west lawn, BLAIR positioned himself between the officers and the crowd and began to walk in the space while waiving a Confederate flag attached to what BLAIR later admitted was a lacrosse stick.  Below are screen shots from K.P.'s body worn camera depicting BLAIR waiving the Confederate flag while standing in front of the crowd that was pushed back on the west lawn:



41.     While walking back and forth in the space between officers and the crowd, BLAIR yelled words to the effect of, "hell naw, quit backing up, don't be scared, we're Americans, don't be scared, let's go quit backing up, quit being scared."  As officers advanced, K.P. shoved BLAIR back toward the crowd using his baton.  BLAIR jumped back and turned to face K.P while squaring up his body to stand in front of K.P. BLAIR held the lacrosse stick attached to the Confederate flag with two hands and started shouting, "what's up motherfucker, what's up, what's up bitch?"  Below are screen shots from K.P.'s body worn camera depicting BLAIR holding the stick with both hands:



42.     BLAIR thrust the stick at K.P towards the chest area, striking him.  Immediately

thereafter, several officers were able to restrain BLAIR on the ground using their batons.  BLAIR

was then removed from the west lawn and transported closer to the U.S. Capitol building where

his arrest would be processed.  While in handcuffs and not in response to any questions prompted

by any members of MPD, BLAIR stated words to the effect of "I understand, what I did, the one

motherfucker swung at me so I kinda switched...so I apologize, we're done though."  BLAIR

provided MPD with a phone number ending in -7210.

43.     MPD transported BLAIR to the U.S. Capitol building, where he was searched

before he was turned over to USCP for processing.  During the search incident to arrest, a black

bag with "TEMPO" in yellow block lettering and light in color drawstrings was recovered from

BLAIR's back.  Within the bag, MPD recovered a silver knife, which BLAIR explained he had

on him "cause I was worried about Antifa and other people trying to jump me."  Additional items

were also recovered from the bag, including tape, which BLAIR acknowledged "looks damn

suspicious" and BLAIR explained "I had a flag with me, I taped it."

44.     While in USCP custody, BLAIR was transported to George Washington Hospital

for a laceration to his head sustained after officers responded with batons following BLAIR's

attack on K.P. BLAIR was then transported to the United States Capitol Police station, where

his arrest was processed.  At the time of BLAIR's processing at 1:41 am on January 7, 2021, an

iPhone with a white frame was recovered from BLAIR's black bag and recorded as part of his

prisoner's property.  Below is a screenshot from the USCP stationhouse video depicting BLAIR

in the white long sleeved shirt, with the white iPhone recovered from his black bag:



45.     In a notarized letter signed on January 9, 2021, BLAIR provided his mother, Gaye L. Blair, with permission to recover his property.  USCP confirmed that Gaye L. Blair picked up property for David BLAIR, which included BLAIR's cell phone.  A photocopy of Gaye L. Blair's Maryland driver's license was taken by USCP, which lists her address as 2195 Sugarloaf Parkview Lane, Clarksburg, Maryland  20871.  Information from Maryland's driver's license issuing agency confirms that a David Alan BLAIR is listed as residing at 2195 Sugarloaf Parkview Lane, Clarksburg, Maryland  20871.  This is the same address listed for Gaye L. Blair, the person identified in the notarized letter as being David BLAIR's mother and authorized to pick up BLAIR's property.

**Search of BLAIR's Residence and Seizure of Device-2**

46.     Device-2 was seized by the FBI on January 22, 2021, pursuant to a search warrant authorizing the search of BLAIR's residence, located at 2195 Sugarloaf Parkview Lane, Clarksburg, Maryland  20871.[5]

47.     On January 22, 2021, your affiant participated in the execution of the Premises Search Warrant.  When the FBI agents arrived, both occupants of the residence, BLAIR and his mother Gaye L. Blair ("Ms. Blair") were awake.

48.     When agents went to what was identified as BLAIR's bedroom, there were only damaged, older model cellular phones located in the bedroom.  The bed was covered with items many of which agents were authorized to seize pursuant to the Premises Search Warrant.  BLAIR volunteered that he had done this because "he figured that [we'd] be coming and these were what you were looking for," or words to that effect.

49.     Ms. Blair identified her bedroom to law enforcement but explained that BLAIR had fallen back asleep in her bedroom, or words to that effect.  Upon entering that bedroom, the agents noticed two cellular phones on the nightstand.

50.     Your affiant retrieved an iPhone from the nightstand to identify whether it was a cellular phone used by BLAIR and subject to seizure.  Your affiant anticipated he would find an

---

[5]The search warrant was issued by United States Magistrate Judge Thomas M. DiGirolamo for the District of Maryland, 1:21-mj-162-TMD (the "Premises Search Warrant"). The pertinent paragraphs of your affiant's Affidavit in support of the Premises Search Warrant are realleged at ¶¶ 7 - 45 of this Affidavit.  The Premises Search Warrant authorized the seizure of digital devices as follows: "[a]n iPhone with a white frame, as well as other digital devices (herein collectively referred as "Devices") used in the commission of, or to facilitate, the TARGET OFFENSES."

Apple iPhone, which, based upon review of the station house video, was believed to have a white front.  The iPhone on the night stand had a white front but the back was a different color, which Apple markets as "Rose Gold."  To identify whether the iPhone was BLAIR's, I asked Ms. Blair for BLAIR's telephone number.  Using her cellular phone, she then dialed the same number that BLAIR provided to MPD the night of his arrest, the iPhone rang, and the caller displayed on the iPhone as "Mom."  On this basis, agents seized that iPhone, more particularly described as a Rose Gold iPhone 6S with a white front, Model 1688, FCC ID:  BCG-E2946A, telephone number (202) 607-7210 (Device-1).

51.     The other phone on the nightstand was a black flip phone, which was powered on.  When asked, Ms. Blair said the flip phone belonged to her, but that she had stopped using the flip phone a while ago.  She consented to a search of the phone.

52.     Your affiant reviewed text messages in the phone, and until approximately June 2020, they seemed consistent with the flip phone being used by Ms. Blair.  I then found a text message which was not consistent with the earlier messages, and became concerned that BLAIR might have begun using the flip phone.  Your affiant recalls seeing the word "son" in the text message that appeared to be directed to the user of the flip phone, potentially indicating that the message may have been directed to BLAIR from his father. In the same text thread with the phone number indicated above, your affiant also observed a link that was sent to the user of the flip phone regarding Capitol activity from January 6, 2021.  As I no longer believed I had consent to search, I closed the flip phone.

53.     Agents recovered the box for the flip phone in the basement, adjacent to a work space which appeared to be BLAIR's place to work on his rifle.    Inside the box was a post-it

22

on which the phrase "my burner phone" was written along with the phone number for the flip phone.  When asked, Ms. Blair stated that she had written the phrase "my burner phone" on the post-it.

54.     On the basis that the flip phone was on the night stand next to BLAIR's iPhone, powered on (even though Ms. Blair stated she no longer used the phone), and the box for the phone had been seized from a workspace in the house that BLAIR used, agents seized the flip phone, more fully described as a Black Alcatel flip phone, Model: A405DL, FCC ID: 2ACCJN023, IMEI:  015551004180225, telephone number (301) 525-7180 (Device-2).

**Probable Cause the Devices Contain Evidence of the Offenses**

55.     There is probable cause to believe that evidence of the Target Offenses will be contained on Device-1 and Device-2, to include:

a.  Images of the Confederate flag, lacrosse stick, and/or silver knife and communications regarding BLAIR's plans to use these items;

b.  Images documenting BLAIR's and others' activities in Washington D.C. on January 6, 2021, and in the days leading up to January 6, 2021;

c.  Images and communications regarding preparation or plans to travel into Washington, D.C., plans to meet other individuals, and plans for activity at the U.S. Capitol;

d.  Communications after January 6, 2021, recounting the events and activity at the U.S. Capitol.

e.   Furthermore, stored GPS location data would disclose where BLAIR was located throughout the course of the events at the U.S. Capitol on January 6, 2021.

56.   Specifically, BLAIR was in possession of an iPhone, consistent with Device-1, at the time he was arrested for his involvement in the criminal conduct described above.  Your affiant believes Device-2 will contain evidence of the Target Offenses because during a review of the contents of Device-2 that was authorized by BLAIR's mother, your affiant observed contents that appear to indicate the phone had been used recently by BLAIR (and not by his mother).  Device-2 was recovered in close proximity to Device-1, which is also believed to be used by BLAIR, for the reasons indicated above.

## TECHNICAL TERMS

57.   Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.   "Digital device," as used herein, includes the following three terms and their respective definitions:

1)   A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited

to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the

25

telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c.    A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

      d.    A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special

sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.     PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  Some PDAs include a memory card or other removable storage media for storing data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.

      f.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

g.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

h.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

j.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.

28

Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

k.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

l.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

m.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an

encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

58.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://support.apple.com/kb/sp726?locale=en_US, I know that the iPhone 6S has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.    Similarly, the manufacturer's advertisements and product technical specifications available online at https://tracfoneusermanual.net/alcatel-myflip-user-manual/, for the Alcatel A450DL, show it has capabilities that allow it to serve as a wireless phone, digital camera, portable media player, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the Target Offenses.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

59.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within Device-2 in whatever form found. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe

that the records and information described in Attachment B will be stored in Device-1 and Device-2 for at least the following reasons:

       a.     Based upon my training and experience, and my experience and that of other agents investigating the Capitol Riots, I know that individuals who engage in the Target Offenses use digital devices, like Device-1 and Device-2, to access applications and websites to facilitate their activity and to communicate with co-conspirators online; to store on digital devices, like Device-1 and Device-2, records and information relating to their illegal activity, which can include photographs and videos documenting their and others' illegal activity; logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts.  On this basis, and on the basis of the facts set forth in this Affidavit, particularly, the facts in ¶¶ 35-37, 52, 55 and 56, there is probable cause that Device-1 and Device-2 will contain evidence of the Target Offenses.

       b.     Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

       c.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as

31

a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

60.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how Device-2 was used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in Device-2 because:

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in Device-2 not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

      b.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

      c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

      d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs,

anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

61.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a

controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.     Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend

36

themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most

smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

        f.       Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of Device-2.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

62.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

        a.      Device-2, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.    The analysis of the contents of Device-2 may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.    In searching Device-2, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of Device-2 will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

63.    Because forensic examiners will be conducting their search of Device-2 in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

39

## **CONCLUSION**

64.    I submit that this affidavit supports probable cause for a warrant to search

Device-2 described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____
Jonathan B. Fugitt
Special Agent
Federal Bureau of Investigation


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on this 2nd day of
February, 2021.


_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE